## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2018, 10:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT MOTHER

Danielle L. Flora
Fort Wayne, Indiana

ATTORNEY FOR APPELLANT FATHER

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of: S.T., Ph.T., and C.T., Minor Children,

W.J., Mother, and P.T., Father,

*Appellants*,

v.

The Indiana Department of Child Services,

*Appellee*.

November 15, 2018

Court of Appeals Case No. 18A-JT-910

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

The Honorable Lori K. Morgan, Magistrate

Trial Court Cause Nos.
02D08-1701-JT-5
02D08-1701-JT-6
02D08-1701-JT-7

**Brown, Judge.**

[1] W.J. ("Mother") appeals the involuntary termination of her parental rights with respect to S.T., Ph.T., and C.T. P.T. ("Father," and together with Mother, "Parents") appeals the involuntary termination of his parental rights with respect to Ph.T., and C.T.[1] We affirm.

## *Facts and Procedural History*

[2] S.T. was born in September 2010, Ph.T. was born in September 2012, and C.T. was born in July 2013. In March 2015, the Department of Child Services ("DCS") filed an amended petition alleging the children were children in need of services ("CHINS"). On May 27, 2015, the court issued an order finding the children to be CHINS. In its dispositional order, the court ordered the children's continued placement in foster care and that Parents refrain from all criminal activity, maintain suitable housing, cooperate with caseworkers, submit to a diagnostic assessment and follow all recommendations, and comply with other requirements of a parental participation plan.

[3] On February 1, 2016, the court issued a permanency plan order which found that Mother had not demonstrated an ability to benefit from services, was ordered to the Department of Correction (the "DOC") and her whereabouts were unknown, and had not complied with the dispositional decree. The court

---

[1] The court also terminated the parental rights of S.T.'s alleged father, who does not participate in this appeal.

found that Father had not completed substance abuse treatment, was on a second referral and was complying with Dockside services, had sporadic visits with the children, and had two negative drug screens. The court ordered a permanency plan of reunifying Ph.T. and C.T. to the custodial care of Father and placing S.T. in the legal custody of Father, as well as a concurrent permanency plan of termination of parental rights with adoption for the children. On July 21, 2016, it issued an order stating that Mother could not be located and failed to maintain regular visitation and communication with DCS, and that Father had failed to participate in therapy and regular visitation.

[4] On October 31, 2016, the court issued another permanency plan order in which it found that the children had been removed from the custodial parent's home for nineteen of the prior twenty-two months; that Mother had failed to participate in therapy, cooperate with homebound services, or refrain from criminal activity; that her whereabouts were unknown and a warrant had been issued for her arrest in a criminal proceeding; and that Father had continued to engage in criminal activity and had not had stable housing during the reporting period. The court also ordered a permanency plan of termination of parental rights with adoption for the children.

[5] On January 4, 2017, DCS filed petitions for termination of Parents' parental rights as to the children, and termination proceedings were held on June 20, August 24, August 31, and December 12, 2017.

On March 12, 2018, the trial court terminated the parental rights of Parents as to the children and made a number of factual findings. With regards to Mother, the court found that, during the CHINS proceedings, DCS had made referrals for services for her, a case manager for Dockside met with her and they set goals of working on housing, budgeting, transportation, and obtaining employment, Mother met sporadically with the case manager and did not meet the goal of obtaining independent housing or transportation, and services ended in July 2015 due to her incarceration. It found Mother has a history of criminal activity including convictions for theft, false informing, conversion, and neglect of a dependent, has violated the terms of her probation and has been in and out of incarceration during the course of the CHINS case, was incarcerated at the time of the termination hearings, and was expected to be released in January 2018. The court found Mother completed a diagnostic assessment with Park Center but failed to appear for her subsequent counseling session and her case was closed. It found that she did not have stable housing during the CHINS proceedings, lived with Father and his aunt for four to five months in 2015, lived with Father and his friend for a short period and was incarcerated for several months that year, and lived with her grandmother in 2016 when she was not incarcerated. It also found the children had been in their foster home since July 2015, Mother's last visit with the children was in October 2015, and Mother did not have employment during the CHINS proceedings, received social security benefits when she was not incarcerated, and had not provided material or financial support.

[7] With respect to Father, the court found that, during the CHINS proceedings, DCS made referrals for Father; he and his home-based services provider set goals of working on coping skills and anger management and participating in individual counseling and substance abuse counseling; he worked with the provider for approximately nine months and was compliant; and Father and Mother were to participate in couples' counseling but were unable to do so due to their patterns of incarceration. It found Father had supervised visits through Dockside from September 2015 through February 2016, missed two weeks of visitations in September 2015 and three in December 2015, last visited with his children through Dockside in February 2016 and failed to appear for additional visits, informed Quality Counseling in September 2016 that he was moving out of state and would no longer be able to visit, and had not visited his children since September 24, 2016. It found a referral was made in April 2015 for Father to participate in substance abuse counseling but he never participated and his case was closed in July 2015. The court further found that Father has a history of engaging in criminal activity and at the time of the termination hearings he was incarcerated for strangulation as a level 6 felony and misdemeanor battery as a class A misdemeanor;[2] that he was originally sentenced to two years suspended and placed on probation which was transferred to Florida in September 2016; and that in September 2016 he entered a plea of no contest to assault of a law enforcement officer in Florida for which he was sentenced to

---

[2] The record shows that Father was convicted of domestic battery as a class A misdemeanor.

ten days. It found that his probation in Fort Wayne was revoked in April 2017 due to the assault conviction and he was ordered to serve two years on his original sentence, and he anticipated he would be released from incarceration in February 2018. The court found Father did not have stable housing or employment during the CHINS proceedings, did not provide material or financial support, testified that he is married to another woman and has seven other children but is not ordered to pay support for them, and advised that he wants the opportunity to take care of the children who are the subject of these proceedings. At the time of the termination hearing, both parents were incarcerated.

[8] The court determined that, by clear and convincing evidence, there is a reasonable probability that the reasons that brought about the children's placement outside the home will not be remedied and that, despite the provision of services and the orders of the court, Parents did not participate in and demonstrate that they benefited from services between the time of the preliminary inquiry until the time of the termination hearing.

[9] In addition, the court found that termination of Parents' parental rights is in the best interests of the children. It found the children had been removed from Parents' home and residing in foster care for more than two years; they are well-bonded with their foster parents and progressing well; and their foster parents desire to adopt and are willing and able to provide them with a safe and stable home. The court noted the children's special needs and their participation in counseling and therapy, and their need for permanency and

stability.  It found that DCS proved by clear and convincing evidence that it has a satisfactory plan for the care and treatment of the children which is adoption.

## *Discussion*

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).

The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.*  This is "a

'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*. Because a case that seems close on a "dry record" may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence. *Id*. at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[12] Mother claims that DCS failed to present clear and convincing evidence that the conditions resulting in the children's removal had not been remedied and points to her acknowledgement that she could have participated more diligently in services and her testimony that she planned to do whatever she could to reunify with the children. Mother also states that she had a release date of January 30, 2018, she has since been released, and her short-term incarceration does not justify the termination of her parental rights.

[13] Father states it is clear that he had compliance issues with the parent participation plan in the CHINS case. He asserts that, while the court made negative findings regarding his housing, counseling, visitation, and criminal history, it did not appropriately credit his efforts and what he had accomplished. He argues he moved from Chicago to Fort Wayne to care for his children when Mother was jailed for shoplifting in January 2018, that one of his therapists indicated he had no problems with Father, and that, while he missed some visits, the assessment for the other visits was that he was very attentive and showed affection to the children. Father also challenges the court's best interests and satisfactory plan findings.

[14] DCS maintains that Mother does not specifically challenge any of the court's findings of fact, the court's findings support its judgment, Mother relies heavily on her own testimony, and her arguments are requests to reweigh the evidence. It argues that Mother, at best, participated minimally in services when she was not incarcerated, she had been incarcerated since January 2017, the children had been in their foster placement since July 2015, and Mother had not visited the children since early October 2015. DCS contends Father had been incarcerated since March 2017 and stated his release date was in February 2018 and that, even if he made improvements, which it argues the record does not reflect, a court can give more weight to a parent's history than to efforts made shortly before termination.

[15] In determining whether the conditions that resulted in the children's removal will not be remedied, we first identify the conditions that led to removal and,

second, we determine whether there is a reasonable probability that those conditions will not be remedied. *See E.M.*, 4 N.E.3d at 642-643. In the second step, the court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* A parent's habitual patterns of conduct must be evaluated to determine the probability of future neglect or deprivation. *See K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1231 (Ind. 2013). Individuals who

pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. *Id.* at 1235-1236.

[16] To the extent Parents do not challenge the trial court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[17] Mother refers to her testimony "[m]y plans are stability and to still go through court and do whatever I can to try to still get my kids." Transcript Volume 1 at 93. The record reveals, however, that Mother failed to refrain from criminal activity, maintain suitable housing, and cooperate with caseworkers. At times her whereabouts were unknown. She failed to regularly participate in individual counseling and couples' counseling, was unable to provide a suitable home or provide materially or financially, and failed to visit with the children even when she was not incarcerated. The children had been in their current foster home since July 2015 and Mother's last visit with them was in October 2015.

[18] As for Father, the record reveals that he did not complete substance abuse treatment, failed to participate in therapy and regular visitation, continued to engage in criminal activity, and had not had stable housing. Father did not provide material or financial support for the children, his drug usage risked the children's safety and well-being, and he testified that he is married to another

woman and has seven other children for whom he is not ordered to pay support.

[19] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the children's removal will not be remedied.

[20] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. The court appointed special advocate testified that termination of parental rights with adoption was in the best interests of the children. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination

order, we conclude that the court's determination that termination is in the best interests of the children is supported by clear and convincing evidence.

[21] In addition, adoption is a "satisfactory plan" for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. DCS's case manager testified that DCS had a plan for the care and treatment of the children and that the plan was to continue to ensure their safety and well-being and for them to be adopted.

## *Conclusion*

[22] We conclude that the trial court's judgment terminating the parental rights of Mother and Father is supported by clear and convincing evidence. We find no error and affirm.

[23] Affirmed.

Altice, J., and Tavitas, J., concur.